Good morning. Please be seated. Welcome to this Sunday morning in the Ninth Circuit. And since you're the only case on calendar, I should advise you, however, that we have other business following this, so as much as we'd love to give you all day to argue, your time is on the clock. And I'm not going to be overly rigid, but you keep your eye on the clock. Okay? So we'll proceed. Woldemichael v. Gonzales. Good morning, judges. May I please have the floor? My name is Thomas Heller, and I'm the attorney appearing on behalf of Mr. Eli Woldemichael, the petitioner in this case. I'd like to use eight minutes of my time and then reserve two minutes for rebuttal. On July 10, 1998, at around 4 in the morning, members of the Ethiopian security forces under the guise of the feared and raided federal police arrested Mr. Woldemichael. He was taken to the Central Investigation Bureau, where he was interrogated, beaten, and tortured. He was gagged and then beaten with a stick on his shoulder, back, leg, and the sole of his foot. He was threatened at gunpoint, and he was kept under such egregious condition for about two weeks. So what happened after that, though? Didn't he return back into society? No. In the face of these horrific facts that should shock our conscience to the core, the immigration judge failed to apply our well-established jurisprudence of refugee law as articulated by our courts, Congress, and the executive branch. She completely ignored the government's need to demonstrate by a preponderance of the evidence that there has been a fundamental change in circumstances that applicants no longer have a well-founded federal prosecution or that there have been a fundamentally changed country condition. How was he treated differently from any other person that fell into the clutches of the police and was maybe suspected of opposing the government? How was he treated any different? Wasn't that pretty much routine to take a person into jail and beat on him for two or three days to see if he would confess to something? The most important thing, Your Honor, is that he was mistreated, and the mistreatment that he suffered was very egregious because he was- Was that because of some protected reason? Yes. What was the protected reason for which he was being beaten? He was actually mistreated because of the fact that he was an ethnic Eritrean, and his mistreatment actually followed the eruption of the war between Ethiopia and Eritrea, and he was held because he was a journalist, and the government suspected that he had leaked information to the government of Eritrea, and he had leaked information- Well, would that be political- Yes. Political persecution, or did they suspect him of being opposed to the government? That would actually be a protected ground based upon both on his political opinion or perceived political opinion because the government suspected him of having passed information. I'm not clear about why being of Eritrean extraction removes him from being an Ethiopian citizen. He was born in Addis Ababa. Correct, Your Honor. And his parents happened to be immigrants from the other side of the line, and he spoke their language. He spoke one of the Eritrean languages, but he also spoke the language of the majority there in Ethiopian. Correct, Your Honor. But his passport says he's Ethiopian, doesn't it? Yes. There is no question that he's Ethiopian, Your Honor. He was actually mistreated because he was an Ethiopian of Eritrean origin, and the government suspected individuals having Eritrean extraction because of the- Were all Ethiopians of Eritrean ancestry mistreated that way? They were not. Most were deported. This is, you know, it's actually common knowledge that after the eruption of the war- We could almost take judicial notice that they were somewhat mistreated, somewhat like Azerians in Armenia or Chechnyans in Russia and so forth. They get mistreated. But does that mean that they're being persecuted for a religious or racial or ethnical reason? Yes, Your Honor. Or is that just garden variety discrimination that seems to be happening all over the world? No, I mean, this is actually a typical case of persecution based upon ethnic origin, Your Honor. Ethiopians of Eritrean origin were actually deported en masse, and the Ethiopian government also refrained from deporting some Ethiopians of Eritrean origin but rather resorted to actually detaining them and torturing them, and that was what happened. Did they have wholesale deportations of Eritreans back to Eritrea from Ethiopia? Yes. Yeah, I mean, the deportation of Eritreans of Eritrean origin, I mean, Eritreans had happened, but also deportation of Ethiopians of Eritrean origin has happened as well. So the government was actually carrying on deportation without due process. There was no process in place, and that was actually what happened against thousands of Eritreans. But this case is not actually based upon fear of deportation. My client was not deported or there was no fear of being deported. He was rather held and he was tortured, and the claim is based upon fear that he would be imprisoned again and he would even face death. After he was beaten and then released, how long did he remain in Ethiopia? Yes, he was, in fact, because the- How long? What was the time period? That would be four months, Your Honor. Four months, and in that time period, is that when he had the export-import license for a bit of time? Yes, Your Honor, but during those four months, he was actually closely followed. He was not allowed to be gainfully employed. Once the government issued him the business license, it later revoked it. He was denied an Ethiopian identification card, which essentially deprived him of earning livelihood in Ethiopia as well. Now, the immigration judge assumed that he was persecuted. Is that not correct? Yes, she assumed that it was persecution, but- And then it turned to whether the government had rebutted his claim that he had a well-founded fear of future persecution. Correct, Your Honor. And there was no – this is actually one of the essential – I mean, this is really the basis of this petition, because there was no basis for the immigration judge to make that finding. There wasn't any evidence for her to actually say that there were – to find that conditions had, in fact, changed, because the decision was entered on July 20, 2000, and she relied on a news release or an article published in the New York Times one day before, on July 19, to actually hold that things have changed. But there wasn't anything there that would really show that the mistreatment of Ethiopians of Eritrean origin would cease. I mean, it would – that would tantamount to claiming that the discrimination toward African Americans ceased as a result of the signing of the Emancipation Proclamation in June of 1865. There wasn't – You may want to save – why don't you save your balance of your time, as you indicated you wanted to. Sure. We'd like to hear from you on rebuttal. I reserve the right to withdraw from my time. May it please the Court. Eric Marsteller for the United States. This case involves two consolidated petitions for review, the first of which is the review of the immigration judge's June 2000 decision. In that decision, the immigration judge assumed the petitioner, Mr. Woldemichael, was credible. This is important because, therefore, all the factual statements that he made are presumed to be truthful. The immigration judge also presumed that Mr. Woldemichael had established past persecution. This is relevant because that creates a presumption that Mr. Woldemichael established a well-founded fear of persecution. However, that presumption can be rebutted under HCFR 1208.13 if the former INS, now the DHS, establishes by a preponderance of the evidence that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution on account of a protected ground. So you're going to – you've done a very good job of summing up. So you brought us right to the key point. What is the evidence of changed country conditions? Well, to be clear, the evidence doesn't have to be simply of changed country conditions. It just has to be a change in circumstances. And that includes changed country conditions and also other changed circumstances after the – after Mr. Woldemichael was detained. I'll begin with the changed country conditions. As opposing counsel noted, there were two New York Times articles submitted, both from June 2000, indicating that the Ethiopians and Eritreans had agreed to a ceasefire. One day before the hearing. That's correct, Your Honor. Given just the way things evolve in world politics, you think that is substantial evidence that an announcement in the New York Times is sufficient to establish that there's been a sea change? Well, it's important for this reason, Your Honor. Mr. Woldemichael's claim was based on the existence of this Eritrean-Ethiopian war. He – the war began in May 1998. He was terminated from his position as a government journalist in June 1998, and he was detained in July 1998. He stated in his statement attached to his asylum application that he was fired in the wake of a fierce and bloody war between Ethiopia and Eritrea. He stated that he was terminated – his termination coincided with the government's stepped-up anti-Eritrean propaganda and that he – We understand that, but the question is a little more basic than that, that can one infer that country conditions have just essentially switched literally overnight based on a New York Times article announcing that they've signed a peace agreement? We have contemporary evidence all the time about people signing agreements. North Korea signed statements. We signed the Kyoto Treaty. I mean, things – you know, things get signed, but do they get implemented? Isn't that really what the government has to show, what's really happening on the ground? Well, in this case, the immigration judge found that the New York Times articles, acting in combination with other factors, other evidence submitted by Mr. Woldemichael, showed that he no longer had an objective and reasonable fear of persecution in Ethiopia. Didn't the government have to show more than the fact of the ceasefire? Wouldn't they have to show that the attitude toward the Eritreans had changed? And there was no evidence of that. And also, the New York Times has been shown to be a bit unreliable just recently. Well, in this case, there's no evidence that the New York Times reporting on the Ethiopian-Eritrean conflict was unreliable. Well, how could – how could they do anything? I mean, all they did was recount a ceasefire. Well, the Board has – The day before. So what was the – what was Mr. Woldemichael supposed to do? That's correct, Your Honor. But the Board's decision was not issued until June 16th of 2003. Well, but it's looking at the evidence before the IJ. You're right, Your Honor. The Board has authority, however, to take administrative notice of changed country conditions. And they can look at country reports. They can take administrative notice of country reports. Well, we don't really know. Look at that Board opinion. What does it say? The Board opinion, it affirms the immigration judge's decision. Yes. And then it states that it also found inconsistencies. What it said was there's a little problem with the burden of proof due to some inconsistencies in the record, not necessarily the statements of the petitioner. They say nothing about changed conditions. They say nothing about really the overcoming of the presumption. That's one of the problems with a VIA opinion, is it not? I agree. The Board's decision doesn't – it doesn't offer as much as could be desired. However, we believe that it's sufficient in this case because it's – basically, it's affirming the immigration judge's decision. So essentially – Yes, it may be, counsel, but you said at least let's pursue the line we were on, which is that they put in an article about an event that happened 24, 48 hours earlier, which has nothing to do with how it's actually implemented on the ground or the changed attitude toward Eritreans. Correct? Correct, Your Honor. Okay, now – okay, just so we're step-by-step. So then you said, well, there was no countervailing evidence. What countervailing evidence would there be? You suggested then there was the opportunity for the Board to consider supplemental or post-hearing I.J. hearing evidence. There's nothing in the Board's decision that suggests they did anything of the sort. So what we are left with that we're reviewing is two New York Times articles, plus, as you say, the I.J.'s reference to the letter of recommendation and other things. But that's the record we have. We don't have anything from the Board or any suggestion that they even considered anything else, do we? There's no indication in the record that the Board considered – The answer is yes, isn't it? Yes. Yes, thank you. I would like to point out, however, that the regulation says the presumption can be rebutted not with changed country conditions, but a change in circumstances. It does. And we believe that after Mr. Woldemichael was detained and released, he received, as you mentioned, a letter from Radio Ethiopia saying that he had been a good employee, that he was temporarily – well, it didn't say temporarily. I apologize. It said that he was on leave from a journalist since June 98 because of the Ethiopian-Eritrean conflict. The record also indicates that journalists in Ethiopia who were subject to possible persecution were those of the private and independent press. Mr. Woldemichael was the government. But what did we make of the fact that he, in fact, was imprisoned and tortured? That very possibly was because of his Eritrean ethnicity, but it doesn't appear that it was because he was a journalist. Well, I thought his testimony was in part because they suspected him of using his position as a government journalist to get access to state secrets, which he was leaking to the Eritreans. Isn't that what he said? That's what he said. He also said that – And as you started out, we have to accept, because there's no credibility finding, that that's true. Correct, Your Honor, but the court also needs to – in determining a well-founded fear, it looks to the objective reasonableness of the claim. And in this case, even if that's what Mr. Woldemichael believes was the reason he was imprisoned, objectively, the evidence, the country condition reports, the Amnesty International articles, all of the country reports indicate that the only journalists who faced any harm in Ethiopia were those who were members of the private and independent press who violated the 1992 press law, and there's no evidence that the government believed Mr. Woldemichael fit into that category, as he was a government journalist. I'd also like to note that Mr. Woldemichael was issued a valid Ethiopian passport in July 1998, which was after he was released. While he said that he had to offer a bribe to receive the passport, it's noteworthy that the passport was never revoked, it was never taken away, it was never invalidated, and he was able to use it to depart the country without incident. And as Your Honor noted earlier, Mr. Woldemichael – When was the passport issued in relation to when he was imprisoned? It was issued after he was released from prison, I believe. Within a four-month period. I believe it was issued on July 7, 1998, Your Honor.  He left the country in October of 1998. You say it's, what, notable that the passport was never revoked? Well, he was able to use it to leave the country, and that's – if the government was – What period of time from the time he got it to the time he left, did he use it? He used it July to October, so three or four months after he obtained it. It was only a two-year passport, anyway. That's correct, Your Honor. Okay. Well, is it true that his efforts to have an adjustment of status because of his marriage to an American citizen is stymied by the fact that he never entered the country? He's still in immigration limbo? That's correct, Your Honor. To the extent that the immigration judge does not have jurisdiction to consider the adjustment application, the Department of Homeland Security might – I believe it still does have jurisdiction. Why wouldn't this be a good case for mediation to sort out whether he has a basis for adjustment and save everybody a lot of time and effort in writing opinions about whether or not he has a justifiable fear of future persecution? As Your Honor is probably aware, in October 2005, the Department of Homeland Security, the Office of the Principal Legal Advisor at Immigration and Customs Enforcement, issued a memorandum which is not binding, but it suggests that the government can exercise prosecutorial discretion in adjustment cases. However, the first criteria in that memorandum is that EOIR, the Executive Office of Immigration Review, has to have jurisdiction over the adjustment application. And in this case, because he's an arriving alien, EOIR does not have such jurisdiction, so the criteria do not apply. There has been a change so that supposedly they treat admissions for entry and removal the same. Isn't that right? I don't believe so, Your Honor. There was a new regulation that came out in May of this year which applied – which says that – I see my time is up, but I'll continue. There's a new regulation that came out in July – I'm sorry, in May of this year which clarifies the rule and says that arriving aliens generally cannot have their adjustment applications considered by the immigration judge. It did clarify an exception to that rule which states that arriving aliens who were given advanced parole to leave the country based on the existence of a filed adjustment application, they're allowed to return to the country and have the immigration judge consider their adjustment application. But arriving aliens who have not been granted advanced parole still cannot have their applications considered by the immigration judge. It can only be considered by the Department of Homeland Security. And as noted, where EOIR lacks jurisdiction to consider an adjustment application, the prosecutorial discretion memorandum does not apply, and therefore it is not a case that is subject to follow-through. Doesn't DHS then on its side of the equation have some part to play in this? In other words, if the Justice Department doesn't have prosecutorial discretion, doesn't the client? Well, the memorandum that I speak of is actually directed towards the client, towards the… That's what I thought. …immigrations and customs… Why does EOIR have to have – isn't EOIR still part of DOJ? EOIR is… It should be when I was there. It is, Your Honor. So I'm – truthfully, because I had something to do with that interchange that led to that issuance. I didn't cause it, but I was chatting with the folks back there, because as Judge Goodwin suggested, there's been some real effort, at least in this circuit, to try to arrive at in certain cases where there seems to be a way to break through the red tape and get to the humanitarian practical merits. And I understood – I think we all did – that that instruction was to free up the DHS reps, people out here in San Francisco, so that they knew that they could exercise some discretion along with whatever their lawyers had to. I'm sort of boiling it down into very general terms. All this split occurred after I left DOJ, so I don't – I'm a novice in it, so I don't want to muddle the record, but I am curious as to this situation. Are you suggesting that nobody has authority now to decide that if you peel away everything, as Judge Goodwin suggested, that there couldn't be an addressing of the adjustment of status issue and maybe resolve it that way? Nobody has the ability or authority to do that? I believe there are – DHS may have that authority, but I think the memorandum speaks of – it's the policy. I can't – I don't – I wasn't there when the policy was written, but the policy clearly states that DHS, Immigrations and Customs Enforcement, is only authorized to exercise prosecutorial discretion in adjustment cases where the immigration judge has jurisdiction to consider the adjustment application. In this case, because Mr. Woldemichael is an arriving alien who has not been granted advanced parole, he – the immigration judge does not have jurisdiction. If I.J. can't do it, then the question is can DHS do it? DHS has – so what's the status of his adjustment of status petition in DHS? I'm not certain, Your Honor. All I know is that under the guidance given to ICE attorneys, that they are not authorized to exercise that discretion absent jurisdiction. I believe – I'm sorry for not directly answering your question, Your Honor. I'm a little uncertain. I believe an adjustment application is handled by Customs and Immigration Services, which is a different section of the Department of Homeland Security. But, you know, we're getting hung up in the bureaucracy. I mean, how – the whole idea of that memo, as I understood it, was to help cut through some of the left-hand, right-hand problem between – at least between DOJ and DHS so that the least matters that were up before us coming from an I.J.'s determination where there was a collateral or pending proceeding could get – you know, you could try and step back and see if there was an ultimate resolution. It sounds like there's some big hole there in this effort. Who can bridge that? Not you or the people you report to. Who does it? I believe – I mean, I'm not certain, Your Honor. I believe it would just have to be someone – How would you become certain? I can check on it, Your Honor, and submit a supplemental information. That would be helpful, because I think the Court is confused in some of these cases through the distinction. I mean, there may be, you know, a matter of statute that precludes it, but I'm – this whole original arrangement was bridging what was really a new attorney-client relationship that created when you split when the – you know, when the DOJ lost control or lost authority over the enforcement side and was actually at the – just acting as lawyers to DHS. So we understand that structural change, but certainly I don't understand exactly how the situation you're talking about arises in such a way that the same principles of trying to get to the ultimate resolution in an efficient way without forcing us as a court to have to write and issue decisions, whether they're published or unpublished, that take up a lot of time and create precedent or at least create problems. Well, I can look into that, Your Honor, and try to determine what the reasons – because the memo is clear that there is an exception, the difference between arriving and unarriving. We have that memo. So I will try to determine what the reasons for that separation are. Okay. Do we know whether he still even has an application pending? I'm not certain of that, Your Honor. Okay. Thank you. Appreciate your answers. Thank you, Your Honor. We have a couple of minutes. First off, can you tell us whether his adjustment of status application is still pending? The adjustment application has actually been denied because, as you're probably aware, from the record the immigration judge denied the application for lack of jurisdiction and claimed that the jurisdiction lies with the district director and his adjustment application was actually filed with the district director and the district director denied the application. He was supposed to file a waiver showing extreme hardship to the relative, but the district director denied the application anyway. So we don't really have any chance with that. And just to say one more thing, this whole problem actually – the different courts I practice in Arlington, I practice with the immigration court in Baltimore, and I would like to mention here that the Arlington court actually handles this kind of cases differently from the court in Baltimore. The court in Baltimore has a different definition for an arriving alien. Unless a person has actually been lawfully admitted, that person is considered to be an arriving alien, but at the immigration court in Arlington that doesn't seem to be the case. I have had several cases like Mr. Walter Michael, and I haven't had any problem adjusting that actually. So it's actually confusion, and different courts handle this differently. To come to the issues raised by government's counsel, it's not clear from the decision of the immigration judge how the ceasefire related to Mr. Walter Michael's claim. There was nothing in these articles regarding issues that would address Walter Michael's well-founded fear. The argument is nothing more than a provisional argument to bring the war to a halt. And as a matter of fact, only the presence of the U.N. peacekeeping force and a demilitarized zone along the 600-mile border and the heavy diplomatic discussions by the Bush administration and other guarantors of the peace agreement is actually what is keeping the two countries from resuming a war. I guess the decision would be wrong and unsupported by the facts today. More than five years after the signing of the peace agreement between the two countries, let alone when even the possibility of a long-lasting peace would be tenable. And we also ask this court to take judicial notice of the current tense relationship between Ethiopia and Eritrea, because most diplomats or politicians believe they are actually at the brink of a war. Okay, I think we have the point. Thank you very much. I appreciate it. And if you would submit a short summary explanation of what you were trying to communicate, it's for the benefit of the court, and if counsel wants to respond to it in some fashion, we'll permit that. Thank you. I appreciate your assistance. We appreciate the argument. The case argued is submitted.
judges: Goodwin, B. Fletcher, Fisher